**WO**                                                                                                          HJ

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Donna D'Angelo,<br><br>        Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of Social Security,<br><br>        Defendant. | No. CV 06-03055-PHX-EHC<br><br>**ORDER** |

This is a proceeding to review a final decision of the Defendant Social Security Commissioner ("Commissioner") denying disability benefits to Plaintiff Donna D'Angelo. The parties filed cross-motions for summary judgment (Dkts. 12, 17), which are fully briefed. For the reasons discussed herein, Plaintiff's motion is granted and Defendant's cross-motion is denied.

**I.     Background**

Plaintiff filed concurrent applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Title II and Title XVI of the Social Security Act on November 13, 2000, alleging that she became disabled on August 22, 2000, due to a sprained ankle, pain in her right shoulder, an injured rotator cuff, and because she heard

voices. (Tr. 200, 219-221, 490-492).[1] Plaintiff's claim was denied initially and after reconsideration. (Tr. 193-197, 200-203, 493-497, 499-502). Plaintiff's claim was then denied by an Administrative Law Judge ("ALJ") in a decision dated May 3, 2002 ("ALJ's first decision"). (Tr. 511-521). In an Order dated October 15, 2002, the Appeals Council vacated the ALJ's first decision and remanded the case for further administrative proceedings. (Tr. 526-529). Following a supplemental hearing on March 3, 2004, the ALJ issued a revised decision denying benefits dated April 9, 2004 ("ALJ's second decision"). (Tr. 59-121, 18-27). The Appeals Council denied Plaintiff's request for review of the ALJ's second decision. (Tr. 8-10). Plaintiff now seeks judicial review of the ALJ's second decision under 42 U.S.C. § 405(g).

**A. Medical Evidence Before the ALJ[2]**

A Concentra Medical Centers transcription dated October 20, 2000, completed by Donald J. Gibertini, D.O., reports that Plaintiff twisted her ankle while working as an usher at the Coliseum, causing a severe sprain. (Tr. 396). The report found no remarkable history and noted that Plaintiff was not taking any medication. (Tr. 396). The treatment plan indicated that Plaintiff would be placed in a sprain walker, given crutches, and placed on Naproxen and Vicodin. (Tr. 396). Plaintiff was also placed on light duty restriction, keeping the foot elevated, and sitting 100% of the time. An injury recheck report dated November 10, 2000, limited Plaintiff to sitting 100% of the time and using a cane while walking. (Tr. 398).

On December 18, 2000, Arizona DDS referred Plaintiff to David R. Young, Ed.D for a mental status examination because Plaintiff's disability application stated that she was

---

[1]The record also contains evidence of a previous application for benefits made on March 13, 1997, although the best copy available of this application is entirely illegible. (Tr. 216-218). Plaintiff alleged disability caused by pain in her arms and hands. (Tr. 246). This application was denied. (Tr. 484-489).

[2]The Court has thoroughly reviewed the lengthy administrative record and provides only a brief summary of the facts herein.

1  hearing voices and believed people were staring at her. (Tr. 399). Dr. Young diagnosed a
2  delusional disorder and major depression, recurrent and severe with psychotic features. (Tr.
3  400-401). Dr. Young opined that Plaintiff would benefit from medication, noting that
4  Plaintiff was not currently on any medication. (Tr. 401). Dr. Young also noted that Plaintiff
5  would have difficulty in the work setting as she has constant experiences of hearing voices
6  which interfere with concentration and ability to adjust. (Tr. 401). Dr. Young completed a
7  medical source statement (mental) of Plaintiff's ability to do work-related activities, placing
8  Plaintiff in a "Fair: Seriously Limited but not Precluded" capacity in every category. (Tr.
9  402-403).

10  On December 20, 2000, Arizona DDS referred Plaintiff to Dr. Neil Edward McPhee,
11  M.D. for a physical examination related to her alleged shoulder pain and sprained ankle. (Tr.
12  404). Dr. McPhee diagnosed rotator cuff disease of both shoulders, severe ankle sprain on
13  the right, and depression. (Tr. 405). Dr. McPhee opined that Plaintiff would be able to sit
14  for two hours continuously for six of eight hours total, stand and walk short distances without
15  aids occasionally, lift 20 pounds occasionally and 10 pounds frequently, crouch and partially
16  stoop, but would have difficulty reaching overhead because of her limited range of motion
17  and painful shoulders. (Tr. 405). Dr. McPhee completed a medical source statement
18  (physical) of Plaintiff's ability to do work-related activities, placing restrictions on Plaintiff
19  to lifting 20 pounds occasionally, 10 pounds frequently, standing and/or walking for 2 hours
20  in an 8-hour workday, sitting 6 hours in an 8-hour workday. (Tr. 407). Dr. McPhee noted
21  that Plaintiff does not use an assistive device and that breaks and lunches would provide
22  sufficient relief for Plaintiff's need to alternate standing and sitting. (Tr. 408). Dr. McPhee
23  also limited Plaintiff's reaching and handling. (Tr. 408).

24  On April 20, 2001, Arizona DDS referred Plaintiff to Dr. Daniel K. Watkins, Ph.D.
25  for a psychological examination. (Tr. 436). Dr. Watkins diagnosed depressive disorder,
26  NOS and psychotic disorder, NOS, noting that Plaintiff retained the cognitive capacity to
27  understand, remember, and carry out short and simple instructions, to remember locations
28  and procedures, to make decisions, to travel independently, to set goals, to ask questions and

1  request assistance, and to maintain generally socially appropriate behavior. (Tr. 438). Dr.
2  Watkins further noted that Plaintiff had never had appropriate treatment and believed that the
3  prognosis for significant improvement with appropriate treatment appeared good. (Tr. 438).
4  Dr. Watkins opined that Plaintiff's ability to respond appropriately to stressors, to maintain
5  emotional stability, and to sustain reliability were moderately impaired. (Tr. 438).

6        On January 26, 2002, Dr. Akhtar Hamidi, M.D. performed a psychiatric evaluation
7  of Plaintiff and diagnosed generalized anxiety disorder, major depression that was recurrent
8  and moderate without psychotic features, chronic pain, and a Global Assessment of
9  Functioning (GAF) score of 50. (Tr. 457-459). Plaintiff continued treatment with Dr.
10 Hamidi. (Tr. 566-577). On March 7, 2002, Dr. Hamidi assigned a GAF score of 70. (Tr.
11 574). On July 12, 2002, Dr. Hamidi assigned a GAF score of 50. (Tr. 569). On July 26,
12 2002, Dr. Hamidi assigned a GAF score of 75. (Tr. 569). On August 23, 2002, Dr. Hamidi
13 assigned a GAF score of 90. (Tr. 567). On May 19, 2003, Dr. Hamidi reported Plaintiff as
14 markedly limited[3] in her ability to respond to work pressures in a usual work setting,
15 although he found only moderate to no impairment in all other categories. (Tr. 608-609).

16       Plaintiff received treatment from Henry Tomlinson, D.O. in 2003. Dr. Tomlinson
17 diagnosed, *inter alia*, fibromaylagia, headaches, chronic back pain, a right rotator cuff tear,
18 and lumbar nerve abnormalities. (Tr. 584-598). On May 29, 2003, Dr. Tomlinson opined
19 that Plaintiff could sit for one hour at a time, stand for one hour at a time, and walk for one
20 hour at a time. (Tr. 583). Dr. Tomlinson opined that Plaintiff could sit for two hours during
21 an eight hour day, stand for one hour during an eight hour day, and walk for one hour in an
22 eight hour day. (Tr. 583). Dr. Tomlinson opined that Plaintiff could occasionally lift up to
23 five pounds, occasionally carry up to five pounds, could use her right hand for simple
24 grasping but not her left hand, could not use either hand for pushing/pulling of controls, and
25 could use her right hand for fine manipulation but not her left. (Tr. 584). Dr. Tomlinson

---

[3]The questionnaire defines "marked" as "serious limitations, ability to function is severely limited." (Tr. 608).

- 4 -

opined that Plaintiff could reach occasionally and classified her pain as moderately severe. (Tr. 585).

### B.     Plaintiff's Testimony

The ALJ's final hearing occurred on March 3, 2004. Plaintiff testified that in July 2003, she had rotator cuff surgery performed by Dr. Erickson and had been undergoing physical therapy ever since. (Tr. 62-66, 623). Plaintiff testified to her daily activities which included walking around the block, riding her bicycle up and down the street a couple of times, fixing breakfast, washing and stacking dishes, dusting, and reading about one book every other week. (Tr. 66-68). Plaintiff lived with her daughter and would babysit her six year old granddaughter and newborn grandson once every other week for two to three hours at a time when her daughter and son-in-law went out to dinner. (Tr. 69). Plaintiff testified that she was able to shower, clean her bedroom, and do crafts such as painting. (Tr. 71). Plaintiff testified that she was able to go to the grocery store with her daughter and take her dog to the groomer. (Tr. 72). Plaintiff testified that she hears whispers but that she takes medication for the whispers and no longer experiences side-effects. (Tr. 71). Plaintiff testified that her pain levels on an average day range between five and eight on a scale of one to ten. (Tr. 72). Plaintiff testified that she naps every day around 2:00 or 2:30 for 30 to 45 minutes. (Tr. 73). Plaintiff testified that she could sit for half an hour or longer, stand for 45 minutes at a time, walk for 30 minutes at a time, could lift a gallon of milk, and had increasing trouble with grasping items. (Tr. 73). Plaintiff testified that she still had fibromyalgia, which was first diagnosed by Dr. Tomlinson. (Tr. 75).

### C.     Medical Expert Testimony

The medical expert testified that he did not have any medical records after the middle of 2003, and could only speak to Plaintiff's condition up through May of 2003. (Tr. 78). Based on his review of the evidence, the medical expert believed that the best diagnosis of Plaintiff's mental condition was a depressive disorder. (Tr. 78). The medical expert could not tell with any specificity whether Plaintiff had any mental limitations until about January 2002, when she was evaluated by Dr. Hamidi. (Tr. 79-80). The medical expert testified that

- 5 -

1  Dr. Hamidi's GAF assessment in January 2002, of 50, would be indicative of someone on
2  the border between moderate and severe symptoms.  (Tr. 86).  The medical expert testified
3  that Dr. Hamidi's later notes indicating GAF assessment of 75 in July of 2002, would be
4  indicative of a person with symptoms but who could function generally across the board.
5  (Tr. 88).  The medical expert testified that with a GAF of 75, the symptoms would come and
6  go, but a person at that level would probably get to work almost every day, although the
7  symptoms of depression might make them less efficient at work.  (Tr. 88).  The medical
8  expert testified that Dr. Hamidi's GAF assessment of 90 on August 23, 2002, indicated
9  normal functioning near total remission.  (Tr. 88).  The medical expert testified that he did
10 not know what was causing Plaintiff more mood disturbances that were reflected in later
11 GAF assessments of 70 to 90 between January of 2003 and May of 2003.  (Tr. 89).  The
12 medical expert testified that Dr. Hamidi's opinion of Plaintiff having marked limitation in
13 dealing with work pressures was based on extrapolation because, at the time, Plaintiff was
14 not in any real life work situations.  (Tr. 91-93). The medical expert testified that there was
15 no objective evidence to support Dr. Hamidi's opinion; the only evidence was that Plaintiff
16 was anxious.  (Tr. 91-93).  The medical expert testified that he did not believe Plaintiff's
17 conditions met or equaled any listed disabilities.  (Tr. 98).

### D.    Vocational Expert Testimony

19 The vocational expert testified that Plaintiff's past relevant work was as a cashier and
20 has no transferable skills.  (Tr. 110).  The vocational expert testified that a person with
21 marked limitation in responding to work pressure, as indicated by Dr. Hamidi, could not
22 sustain work.  (Tr. 114-115).  The vocational expert testified further that if the same
23 limitations were mild to moderate, rather than marked, it would be somewhat of an arbitrary
24 opinion because it's possible that such a person could sustain work and also possible that
25 such a person could not sustain work under such limitations.  (Tr. 115).  The vocational
26 expert testified that a person with the serious restrictions noted by Dr. Young could not do
27 any type of work**.**  (Tr. 118).  The vocational expert testified that a person with a GAF of 50
28 would not be able to sustain employment.  (Tr. 118).

**E.     The ALJ's Findings**

The ALJ found that Plaintiff's allegations regarding her limitations were not totally credible, but that Plaintiff retained the residual functional capacity to carry out light physical activity with restrictions on overhead reaching, she was capable of understanding, carrying out and remembering simple job instructions, she was capable of using judgment in making work-related decisions, she was capable of responding appropriately to supervision, co-workers and work situations, and she was capable of dealing with changes in a routine work setting. (Tr. 26). The ALJ found that Plaintiff's past relevant work as a café cashier did not require the performance of work-related activities precluded by her residual functional capacity and that Plaintiff's medically determinable impairments do not prevent the claimant from performing her past relevant work. (Tr. 26). Thus, the ALJ concluded that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 26).

**II.     Standard of Review**

The Court reviews the Commissioner's final decision under a substantial evidence standard; the decision will be disturbed only if it is not supported by substantial evidence or based on legal error. See 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."). "Substantial evidence" means "more than a scintilla," but "less than a preponderance." Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal citations omitted). In determining whether the Commissioner's finding are supported by substantial evidence, the Court considers the evidence as a whole, giving a full review to all the facts. Smolen, 80 F.3d at 1279.

**III.     Discussion**

The Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in the following five-step evaluation:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, App. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the residual functional capacity ("RFC") to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005); 20 C.F.R. § 404.1520. Here, the ALJ found that Plaintiff satisfied steps one and two. Plaintiff "has not engaged in substantial gainful activity since [August 22, 2000,]" and has "severe" impairments within the meaning of the Act and Regulations. (Tr. 26). In step four, the ALJ determined that Plaintiff was capable of performing her past relevant work, and on that basis, found that Plaintiff was not disabled. (Tr. 26).

### A. The ALJ's Rejection of Dr. Tomlinson's Opinion

Plaintiff contends that the ALJ wrongfully rejected the opinion of Plaintiff's treating physician, Dr. Tomlinson. Dr. Tomlinson diagnosed fibromyalgia, headaches, chronic back pain, a right rotator cuff tear, and lumbar nerve abnormalities. (Tr. 584-598). He also opined that Plaintiff's pain was moderately severe (Tr. 585) and that she could occasionally lift up to five pounds but could never lift anything above five pounds. (Tr. 583). The ALJ rejected this assessment, noting that Plaintiff had testified that she could lift a gallon of milk, which weighs about eight pounds. (Tr.24). The ALJ also found that the physical functional limitations outlined by Dr. Tomlinson were conclusory and unsupported by clinical findings. (Tr. 24).

Plaintiff contends that the ALJ improperly disregarded the opinion of Dr. Tomlinson, Plaintiff's treating physician. "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." See Orn v. Astrue, 495 F.3d 625, 631

- 8 -

1  (9th Cir. 2007) (citing C.F.R. § 404.1527). The Administration has explained that an ALJ's
2  finding that a treating source medical opinion is not well-supported by medically acceptable
3  evidence or is inconsistent with substantial evidence in the record means only that the
4  opinion is not entitled to controlling weight, not that the opinion should be rejected. See Orn,
5  495 F.3d at 632 (citing § 404.1527). Treating source medical opinions are still entitled to
6  deference and, in many cases, will be entitled to the greatest weight and should be adopted,
7  even if it does not meet the test for controlling weight." Orn, 495 F.3d at 632; see also
8  Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983) ("If the ALJ wishes to disregard the
9  opinion of the treating physician, he or she must make findings setting forth specific,
10 legitimate reasons for doing so that are based on substantial evidence in the record.").

11 A review of the ALJ's decision reveals little in the way of explanation for the
12 rejection of Dr. Tomlinson's opinion. The ALJ notes Plaintiff's ability to lift a gallon of
13 milk, which weighs eight pounds, as inconsistent with Dr. Tomlinson's assessment that
14 Plaintiff could only lift five pounds. The ALJ also highlights absence of records regarding
15 Plaintiff's 2003 rotator cuff surgery and Plaintiff's own testimony that there had been
16 improvement in her arm after the surgery. (Tr. 24). The ALJ then concludes that Dr.
17 Tomlinson's opinion was not supported by clinical findings because of these inconsistencies.
18 (Tr. 24). The record, however, contains numerous chart notes discussing Plaintiff's back
19 pain and fibromyalgia, as well as diagnostic work finding nerve conduction abnormalities
20 and a rotator cuff tear. (Tr.582-594). The ALJ's determination that Dr. Tomlinson's opinion
21 was not supported by clinical findings was erroneous in light of the entire record, and the
22 highlighting of the inconsistency regarding the weight of a gallon of milk and the apparent
23 absence of certain medical records does not amount to substantial evidence for rejection of
24 Dr. Tomlinson's opinion. As Plaintiff's treating physician, Dr. Tomlinson's opinion was
25 entitled to great weight and should have been adopted. See Orn, 495 F.3d at 632.

26        **B.    The ALJ's Rejection of Dr. Hamidi's Opinion**

27 Plaintiff further contends that the ALJ wrongfully rejected the opinion of Plaintiff's
28 treating psychiatrist. The ALJ apparently rejected the opinion of Dr. Hamidi based upon the

1  testimony of the medical expert who opined that the limitations noted by Dr. Hamidi could
2  not be reconciled with the mild signs/symptoms in his contemporaneous reports.  (Tr.22).
3  Plaintiff contends that Dr. Hamidi's opinion was corroborated by the findings of the
4  examining doctors, Dr. Young and Dr. Watkins, and therefore, that the ALJ was required to
5  give controlling weight to Dr. Hamidi's opinion or provide clear and convincing reasons for
6  not doing so.  See e.g., Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) ("To reject
7  the uncontroverted opinion of a claimant's physician, the ALJ must present clear and
8  convincing reasons for doing so.").  Dr. Young diagnosed a delusional disorder and major
9  depression, recurrent and severe with psychotic features  (Tr. 400-401), and placed Plaintiff
10 in a "Fair: Seriously Limited but not Precluded" capacity in every category on the medical
11 source statement (mental) of Plaintiff's ability to do work-related activities.  (Tr. 402-403).
12 Defendant contends that the ALJ impliedly rejected Dr. Young's opinion by giving weight
13 to the testimony of the medical expert.  The medical expert testified consistently, however,
14 that Plaintiff's best diagnoses based on his review of the evidence was depressive disorder.
15 (Tr. 78).  Thus, it is not clear that the ALJ rejected the opinion of Dr. Young, who also noted
16 depression.  Dr. Watkins also diagnosed depressive disorder and psychotic disorder after
17 examining Plaintiff (Tr. 438), and opined that she was moderately impaired in her ability to
18 sustain reliability.  (Tr. 438).

19       The Court does not find clear and convincing reasons in the ALJ's opinion supporting
20 the rejection of Dr. Hamidi's opinion.  Where a treating doctor's opinion is not contradicted
21 by another doctor, it may be rejected only for "clear and convincing" reasons supported by
22 substantial evidence in the record.  Orn, 495 F.3d at 632.  Even if the treating doctor's
23 opinion is contradicted by another doctor, the ALJ may not reject this opinion without
24 providing "specific and legitimate reasons" supported by substantial evidence in the record.
25 Orn, 495 F.3d 632.  The ALJ's rejection of Dr. Hamidi's opinion was based largely upon the
26 testimony of the medical expert who opined that Dr. Hamidi's entries on the checklist were
27 not well documented and may have been the result of extrapolation.  (Tr. 23).  As Plaintiff's
28 treating psychiatrist, Dr. Hamidi's opinion was controlling if uncontradicted.  Orn, 495 F.3d

at 632. Orn, 495 F.3d at 632. Even if Dr. Young's and Dr. Watkins' opinions were contradictory, as Defendant contends, Dr. Hamidi's opinion was still entitled to deference and should have been adopted absent substantial evidence in the record. The Court does not find the ALJ's reliance on the medical expert testimony to constitute substantial evidence, nor does the Court believe that Dr. Young and Dr. Watkins rendered findings that contradict those of Dr. Hamidi. Both Dr. Young and Dr. Watkins noted depression, which is consistent with Dr. Hamidi's central diagnoses. Thus, the ALJ should have adopted the opinion of Dr. Hamidi.

### C.     The Fairness of the Proceedings Before the ALJ

Plaintiff makes the additional claim that she was denied a fair and just process before the ALJ, and again, on administrative appeal. Plaintiff contends that following the remand by the Appeals Council to the ALJ for a second hearing, she submitted updated medical records. On the date of the scheduled hearing, June 2, 2003, those medical records were not found to be in the hearing file and the ALJ postponed the hearing and expressed displeasure with Plaintiff for being late to the hearing. (Tr. 132). A second hearing was scheduled for September 22, 2003, and the ALJ had failed to schedule a medical expert for that hearing and postponed the hearing again. (Tr. 45). A third hearing was scheduled for December 1, 2003, with both a medical expert and a vocational expert. (Tr. 39). Before the hearing was to begin, the ALJ advised that the wrong medical expert had been scheduled and that she would not proceed with the hearing. At the final hearing, on March 3, 2004, both a medical and vocational expert testified. Plaintiff contends that the scheduling of experts was not consistent in the first three schedules and that this points out inconsistency by the ALJ. Plaintiff further contends that the rescheduling of hearings suggests that the ALJ may have been "very displeased" with Plaintiff's tardiness to the first hearing as well as with the circumstance of having to deal with the case on remand.

The Court must begin with the presumption that the ALJ is unbiased, and exercised her decision-making authority with honesty and integrity. See Bayliss v. Barnhart, 427 F.3d 1211, 1215 (9th Cir. 2005) (citing Schweiker v. McClure, 456 U.S. 188, 195-196 (1982));

Withrow v. Larkin, 421 U.S. 35, 47 (1975). Plaintiff can only rebut these presumptions by showing that the ALJ engaged in conduct that was so extreme it deprived the hearing of fundamental fairness mandated by due process. See Bayliss, 427 F.3d at 1215-16 ("'Expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display' do not establish bias."). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (U.S. 1976) (citation omitted).

Here, Plaintiff points to the ALJ's dissatisfaction with Plaintiff's tardiness, several postponements in the hearing process and changes in the scheduled medical experts as evidence of bias. These allegations are without merit. The fact that the ALJ postponed hearings to correct errors, to obtain additional evidence, and to ensure the presence of a competent medical expert demonstrate that the ALJ was attempting to provide Plaintiff every opportunity to have a fair and unbiased hearing. Thus, Plaintiff has failed to rebut the presumption of regularity afforded the ALJ.

**D.     The Fairness of the Delay During the Administrative Appeals Process**

Plaintiff further contends that the Social Security Administration failed to afford due process by taking two and a half years from the filing date on April 19, 2004, to the response by the Appeals Council on November 20, 2006. Plaintiff contends that it required a Writ of Mandamus before the Appeals Council issued their denial.

In considering Plaintiff's separate claim that the delay in the administrative appeals process deprived her of due process, the Court must consider the reasonableness of the administrative delay in light of the resources that Congress has supplied to the agency for the exercise of its functions, as well as the impact of the delay on Plaintiff's interests. See Wright v. Califano, 587 F.2d 345, 353-54 (7th Cir. 1978). The passage of time alone is rarely enough to justify a court's intervention in the administrative process, especially since "administrative efficiency is not a subject particularly suited to judicial evaluation." Wright, 587 F.2d at 353-54. While a two and one half year delay appears excessive, it is impossible

for the Court, without more, to determine whether such a delay was reasonable in light of the resources of the Social Security Administration. Because the Court finds that Plaintiff is entitled to retroactive benefits, it is at the very least arguable that the delay in the administrative appeals process harmed Plaintiff's interests by prolonging her wait. As discussed below, Plaintiff's wait is over, and her case will be remanded for the sole purpose of awarding benefits.

**IV.    Conclusion**

The ALJ should have adopted the opinions of Plaintiff's treating doctors, Dr. Tomlinson and Dr. Hamidi. Based on the opinions of these doctors and the testimony of the vocational expert, Plaintiff is unable to perform her past relevant work as a cashier. Thus, the ALJ erred in step four by not finding Plaintiff disabled based upon her inability to perform her past relevant work. It is within the discretion of the Court to remand for additional evidence as to whether Plaintiff could perform any work with her residual functional capacity, or award benefits based on the evidence in the record. See Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987). Plaintiff's past relevant work as a cashier was unskilled and her inability to perform such unskilled work combined with her lack of transferable skills likely renders her unable to perform any type of work that exists in the national economy. Indeed, the vocational expert testified that a person with marked limitation as diagnosed by Dr. Hamidi, and serious restrictions as noted by Dr. Young could not perform any work. (Tr. 114-115, 118). Thus, Plaintiff is disabled as defined by the Social Security Act because she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In light of the extensive delay in Plaintiff's application for benefits, the Court invokes its discretion and remands this case for the payment of benefits beginning on August 22, 2000. Further delays at this point would be unduly burdensome on Plaintiff.

Accordingly,

**IT IS ORDERED:**

1. **GRANTING** Plaintiff's Motion for Summary Judgment (Dkt. 12).
2. **DENYING** Defendant's Cross-motion for Summary Judgment (Dkt. 17).
3. **REVERSING** the decision of the Commissioner denying benefits.
4. **REMANDING** for payment of benefits for Plaintiff's disability beginning on August 22, 2000.

DATED this 27th day of December, 2007.

*Earl H. Carroll*
Earl H. Carroll
United States District Judge